**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| MARY KAY INC., | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | |
| | § | C.A. NO.: |
| BEVERLY WANZA, FAITH BY | § | |
| DESIGN, LLC., and JOHN DOES 1-10, | § | DEMAND FOR JURY TRIAL |
| | § | |
| Defendants. | § | |
| | § | |

**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR
VIOLATION OF 15 U.S.C. § 1114, 15 U.S.C. § 1125(a), 15 U.S.C. § 1125(c),
AND RELATED CLAIMS**

Plaintiff Mary Kay Inc. ("Mary Kay") brings this action against Defendants Beverly Wanza ("Wanza"), Faith By Design, LLC., and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114 and 15 U.S.C. § 1125; (2) trademark counterfeiting in violation of the Lanham Act, 15 U.S.C. § 1114; (3) false association in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (4) trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); (5) trademark dilution in violation of Tex. Bus. & Com. Code § 16.103; (6) trademark infringement and unfair competition under Texas common law; and (7) breach of contract.  These claims arise from Defendants' misappropriation and counterfeiting of Mary Kay's trademarks in connection with Defendants' unlawful and unauthorized sale on the Internet of materially different products bearing Mary Kay's trademarks to unwitting customers.  In support of its complaint, Mary Kay alleges as follows:

## <u>PARTIES</u>

1.      Mary Kay is a corporation, organized under the laws of Delaware, with its principal place of business at 16251 Dallas Parkway, Addison, Texas 75001.

2.      Wanza is a natural person who resides at 6704 Tokalon Lane, Arlington, Texas 76002.  Upon information and belief, Wanza operates or assists in the operation of an online storefront on www.amazon.com ("Amazon") that is currently called "OneTimes2" (the "Amazon Storefront").     The     Amazon     Storefront     can     be     accessed     at https://www.amazon.com/sp?seller=A2DXYVP8PLZIAO.  Upon information and belief, Wanza also operates or assists in the operation of a private website called "Faith By Design" that can be accessed at https://www.faithbydesign.net/ (the "Faith By Design Website").

3.      Faith By Design, LLC. is a limited liability company, organized under the laws of the State of Texas, with its principal place of business located at 6704 Tokalon Lane, Arlington, Texas 76002.  Upon information and belief, Faith By Design, LLC. operates or assists in the operation of the Amazon Storefront and the Faith By Design Website.

4.      Upon information and belief, Wanza is in control of, a principal of, and primarily responsible for Faith By Design, LLC. and its actions.

5.      Mary Kay asserts claims against Wanza in both her individual capacity as well as her capacity as a corporate officer of Faith By Design, LLC.

6.      Until it conducts discovery, Mary Kay cannot determine whether Wanza in her individual capacity, Faith By Design, LLC., or both operate the Amazon Storefront and the Faith By Design Website.

7.      Alternatively, upon information and belief, Wanza directs, controls, ratifies, participates in, or is the moving force behind the sales of infringing products bearing Mary Kay's trademarks by Faith By Design, LLC.  Accordingly, Wanza is personally liable for infringing activities of Faith By Design, LLC. without regard to piercing the corporate veil.

8.      Alternatively, on information and belief, Faith By Design, LLC. follows so few corporate formalities and is so dominated by Wanza that it is merely an alter ego of Wanza.  This is reflected, in part, by the fact that the publicly-listed registered office street address and mailing address for Faith By Design, LLC. are the same address as Wanza's home residence.  Accordingly, Mary Kay is entitled to pierce the corporate veil of Faith By Design, LLC. and hold Wanza personally liable for the infringing activities of Faith By Design, LLC.

9.      Mary Kay believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute.  The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise of these individuals or entities are unknown to Mary Kay.  Therefore, Mary Kay sues these Defendants by the fictitious names John Does 1 through 10.  When the true names, involvement, and capacities of these parties are ascertained, Mary Kay will seek leave to amend this Complaint accordingly.  If Mary Kay does not identify any such parties, it will dismiss these Defendants from this action.

## JURISDICTION

10.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Mary Kay's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and its claims arising under the laws of the State of Texas are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

11.      This Court has personal jurisdiction over Defendants because Defendants reside within Texas and transact business within Texas.  Defendants store their inventory within Texas

and ship infringing products from Texas when consumers purchase products from Defendants over the Internet.

12.    This Court also has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Texas and established sufficient minimum contacts with Texas by, among other things, advertising and selling infringing products bearing Mary Kay's trademarks to consumers within Texas through multiple highly interactive commercial websites, through the regular course of business, with the knowledge that Mary Kay is located in Texas and is harmed in Texas as a result of Defendants' sales of infringing products to Texas residents.  Defendants know that Mary Kay is located in Texas, among other reasons, because Wanza used to be a Mary Kay Consultant and is well aware that Mary Kay is located in Texas. Defendants also received a cease-and-desist letter from Mary Kay that identified Mary Kay as a corporation located in Texas.   Mary Kay's claims arise out of Defendants' sales of infringing products bearing Mary Kay's trademarks to Texas residents through the regular course of business.

## VENUE

13.    Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Mary Kay's claims occurred within this judicial district, or in the alternative because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS
### Mary Kay and Its Trademarks

14.    Mary Kay is a global manufacturer and wholesale distributor of cosmetics, skin care products, toiletries, and other related products.  Mary Kay's products are sold in over thirty-five countries, including the United States, and the Mary Kay brand is recognized for its quality worldwide.

15.     Mary Kay uses a direct-sales business model designed to ensure that consumers only receive products that meet the company's high quality standards.  Mary Kay products are available to the public exclusively through Mary Kay Independent Beauty Consultants (hereafter, "Consultants"), who must enter into contracts with Mary Kay to be able to sell Mary Kay products.

16.     Mary Kay devotes a significant amount of time, energy, and resources to protecting the value of its brand, products, name, and reputation.  Through its contracts with Consultants, Mary Kay requires Consultants to provide customer services and follow various quality controls including requirements relating to product storage, handling, inspection, sales channel restrictions, and providing consultation and guidance on the safe and proper use of Mary Kay products (collectively, the "Consultant Obligations").  By selling its products exclusively through Consultants, Mary Kay is therefore able to ensure the satisfaction of consumers and maintain the integrity and reputation of the Mary Kay brand.  In the highly competitive cosmetics products market, product quality and customer service are a fundamental part of a consumer's decision to purchase a product.

17.     Mary Kay first began using the MARY KAY® trademark in 1963.  Since that time, Mary Kay has continuously used the MARY KAY® mark in commerce in connection with the sale of cosmetics products and other types of products.

18.     To promote and protect its intellectual property rights, Mary Kay has registered numerous trademarks with the United States Patent and Trademark Office.  These trademarks include, but are not limited to: MARY KAY® (U.S. Trademark Registration Nos. 0817516, 1070841, 1545983, 1842599, 2542184, 2559020, 3470956) and MK® (U.S. Trademark Registration Nos. 2559020, 3909669, 4509594, 4509597) (collectively, the "Mary Kay Trademarks").

19.     The registration for each of the Mary Kay Trademarks is valid, subsisting, and in full force and effect.  Pursuant to 15 U.S.C. § 1065, the Mary Kay Trademarks serve as conclusive evidence of Mary Kay's ownership of the marks and of its exclusive rights to use the marks in commerce and in connection with the sale and distribution of Mary Kay's products identified in the registrations.  *See* 15 U.S.C. § 1115(b).

20.     Mary Kay actively uses and markets the Mary Kay Trademarks in commerce.

21.     Due to the quality and exclusive distribution of Mary Kay's products, and because Mary Kay is recognized as the source of high quality products, the Mary Kay Trademarks have substantial value.

### Online Marketplaces and the Threat They Pose to Mary Kay's Quality Controls, Reputation, and Goodwill

22.     E-commerce retail sales have exploded over the past decade.  From 2007 to the beginning of 2018, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.2% to 9.4%.  E-Commerce Retail Sales as a Percent of Total Sales, FEDERAL RESERVE BANK OF ST. LOUIS, March 13, 2019, https://fred.stlouisfed.org/series/ECOMPCTSA.

23.     In 2018, consumers spent $517.36 billion on e-commerce sales, a 15% increase from 2017.  The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2018, United States consumers spent $206.82 billion in e-commerce sales on Amazon, a 16% increase from 2017.  See Fareeha Ali, U.S. ecommerce sales grow 15.0% in 2018, DIGITAL COMMERCE 360 (March 13, 2019), https://www.digitalcommerce360.com/article/us-ecommerce-sales/.

24.     Although online marketplaces are becoming increasingly popular among consumers, they also greatly challenge a manufacturer's ability to control the quality and safety of its products.

25.     Online marketplaces allow third parties to sell products anonymously (*i.e.*, without disclosing their actual identity or sources to consumers).  As a result, any person who is able to obtain a manufacturer's products through unauthorized diversion can sell the products on the online marketplaces without having to reveal his or her identity to the consuming public.  This effectively prevents manufacturers and consumers alike from being able to reach online marketplace sellers and address quality concerns.

26.     Consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they select over the Internet will arrive and be of the quality they expect and typically receive from the manufacturer.

27.     It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through manufacturers' authorized channels.  Unauthorized sellers also frequently mix in fake products when shipping products to unwitting consumers.  Scott Cohn, Greed Report: Your quest for savings could land you in the "gray market," CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html.  Indeed, there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust online marketplaces and think that the products they are buying through the marketplaces are genuine.  Spencer Soper, Amazon Gets Real About Fakes, BLOOMBERG, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes.

28.     In its 2018 annual report to its shareholders, in fact, Amazon admitted that third-party sellers on its marketplace may be selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), available at https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x10k .htm.  Amazon acknowledged that these actions are "violating the proprietary rights of others."

29.     Because unauthorized sellers on online marketplaces operate anonymously, a manufacturer has no ability to exercise its quality controls over the products they sell or to ensure that the products are safe and authentic.  A manufacturer's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, some of a manufacturer's products are applied to consumers' bodies.

30.     These dangers of online marketplaces also threaten a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

31.     When purchasing products on an online marketplace, customers are not informed whether a seller of a product is authorized by the manufacturer.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer when they purchase an online marketplace, or at minimum from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "By [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the manufacturer or brand owner.

32.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

33.     When a customer purchases on a marketplace and receives a product that is damaged, defective, expired, soon-to-expire, counterfeit, or of otherwise poor quality, the customer is much more likely to associate that frustration with the brand/manufacturer than the anonymous seller.

34.     Online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances: product reviews.  Any consumer who is dissatisfied with a product he or she receives can post a review on the marketplace for all other consumers to see.  Most often, these reviews, which are often permanently fixed, will criticize the brand/manufacturer rather than the seller.

35.     Product reviews have a significant impact on a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews when buying a new product online and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, Online reviews, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

36.     Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, one survey found that consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by brand owners.  Moms Place Trust in Other Consumers, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.     Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade

Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019,  https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

37.    Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a brand owner's reputation and goodwill.

**Mary Kay's Reputation and Goodwill Have Been Harmed By Numerous Online Reviews Written By Consumers Who Purchased Poor Quality Products from Unauthorized Sellers Through Online Marketplaces**

38.    Consumers who purchase from anonymous, unauthorized sellers on online marketplaces frequently receive poor-quality products and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

39.    Numerous consumers have written negative reviews of Mary Kay products being offered for sale on online marketplaces.  In these reviews, consumers have given Mary Kay products low "ratings" and complained of receiving products that were expired, damaged, tampered with, counterfeit, or otherwise different from what was advertised.

40.    For example, on August 17, 2019, Amazon user "Singh" complained that he purchased a Mary Kay product on Amazon that was open, did not have a seal, and appeared to be previously used.



Singh

★☆☆☆☆ **Not new**
August 17, 2019
**Verified Purchase**
Cream was open and didn't have a seal on it and it looked like someone used it

41.   On July 27, 2019, Amazon user "MRBUBBLES" complained that he purchased a Mary Kay product on Amazon that was "fake," not sealed, and caused his eyes to burn.



42.   On May 30 2019, an Amazon Customer complained that she received a Mary Kay product through Amazon that did not have a box, had its expiration date "taken off," and had a "yellow color" rather than "white cream."



43.   On May 25, 2019, Amazon user "Susan Ballard Harmon" complained that she received a Mary Kay product through Amazon that was "not in a Mary Kay packaging box" and "had a yellowing old look to it."



44.   On May 24, 2019, a Kindle Customer complained that she purchased Mary Kay lotion on Amazon that "has a severe smoke smell."  She suspected that she had received "damaged products they are trying to re-sell."



45.     On April 26, 2019, Amazon user "Lauren Cassimatis" reported that, after purchasing what purported to be a Mary Kay product on Amazon, she received a "fraud product." She explained that there "was no seal on the product and it was clearly NOT Mary Kay's eye makeup remover.  It is very oily and not the same."



46.     On March 21, 2019, Amazon user "Beautiful" complained that she received a Mary Kay product on Amazon that was defective.  She reported that "I have bought this product before and it worked good but this last time I got it only made my skin dry red and burn.  I know there is something wrong with this product."



47.     On March 19, 2019, an Amazon Customer complained that a Mary Kay product she purchased on Amazon felt like "it's been watered down" and "does not remove makeup like it should."  She explained that she had not experienced these issues when buying products from her friend who is a Consultant.



48.     On January 11, 2019, Amazon user "The W Collection" reported that, after purchasing what purported to be a Mary Kay product on Amazon, she received a product that "is NOT MK!!!"   She explained that the product "smells terrible," "immediately made my skin irritated," and had different print from a genuine Mary Kay product she compared it to.



49.     On December 15, 2018, Amazon user "Forest Billington" complained that he would not be "a Mary Kay customer any longer" because a Mary Kay product he received through Amazon caused him to believe that Mary Kay had changed the formula of the product.



50.     On November 5, 2018, an Amazon Customer complained that she purchased a Mary Kay product on Amazon that was eight years old and "broke my face out."  She admonished sellers to "[c]heck the dates on the product before you send it out."



51.     On October 7, 2018, Amazon user "Jayla" reported that, after purchasing what purported to be a Mary Kay product on Amazon, she received a product that was "fake." She complained that the product "[s]mells like some $1 drug store cream plus it's all sticky on my face."



52.     On September 29, 2018, Amazon user "Nadia" complained that she received a Mary Kay product through Amazon that had a "thank you" sticker covering up the product's expiration date. When she removed the sticker, she discovered that the product had expired almost one year before she purchased it.



53.     On September 13, 2018, Amazon user "rhonda" reported that she had thrown away a Mary Kay product she purchased on Amazon and "won't buy again" because the product "smelled old."



54.     On August 30, 2018, Amazon users "Rebecca and Faical Khalfouni" reported that they were very angry because they purchased a Mary Kay product on Amazon that had been expired for over a year.



55.     On September 2, 2016, an Amazon Customer complained that he received a Mary Kay product through Amazon that was 9 years old.



56.     On November 11, 2015, Amazon user "Emmasmom" complained that she received a Mary Kay product through Amazon that was "not the same as you would buy from a consultant." She explained that the product "didn't even have the same consistency as my original bottle" and was either "tampered with and filled with water or it was very old."



57.     On May 1, 2015, Amazon user "LWT" complained that she purchased a Mary Kay product on Amazon that was "like paste." She added that "I've used this exact product in the past (purchased from MK consultant) and this was not the same consistency."



58.     On February 22, 2015, Amazon user "Thi Nguyen" complained that after purchasing what purported to be a Mary Kay product on Amazon, she received a product that was "fake," "not authentic," and "mixed with another substance." She explained that she had used authentic Mary Kay products in the past, and in the product she received "[y]ou can see clearly in the middle where there's a separation of different liquids."



59.     On January 30, 2015, Amazon user "Eduardo Antunes Bartoluzzi" complained that Mary Kay products he purchased on Amazon "did not appear new," and arrived in packaging that "looks very old" and "came all dented and scratched.  He asked, "what happened?"



60.     On October 6, 2014, Amazon user "Tony D" complained that he received a Mary Kay product through Amazon that was missing half of its content and "[s]eemed old."



61.     On April 26, 2014, Amazon user "Liza Richard" complained that she received a Mary Kay product through Amazon that was in torn up boxes and had been opened, which caused lotion to "[spill] out the top" and be "on the side of the bottle."  She stated that it was "ridiculous that someone would sell this!"



62.     On January 29, 2014, Amazon user "remnant" complained that a Mary Kay product she purchased on Amazon "smelled like crap when I first opened it and it still does."   She also complained that the product had been expired for two years, which the seller had not disclosed in the product listing.



63.     On February 19, 2013, Amazon user "Bonnie" complained that she received a Mary Kay product through that had been previously opened and used before it was shipped to her.



64.     On October 23, 2012, Amazon user "Ana" complained that she received a Mary Kay product through Amazon that had been expired for more than four years.   She described the experience as a "disgrace."



65.     The foregoing reviews are only a small sample of negative reviews of Mary Kay products that appear on the Amazon website.

66.     Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review.  Given that Defendants are selling a high volume of products bearing the Mary Kay Trademarks on Amazon and are not subject to Mary Kay's quality controls, however, it is very likely that some of the foregoing negative reviews were written by customers who purchased products bearing the Mary Kay Trademarks from Defendants.

**Mary Kay Prohibits Sales on Online Marketplaces, Exercises Strict Quality Controls Over the Production and Distribution of Its Products, and Provides a Satisfaction Guarantee for Products Purchased from Consultants**

67.     Mary Kay maintains quality control over its products by allowing Mary Kay products to be sold to end-user consumers only by Consultants.  Mary Kay enforces the quality controls that Consultants are required to follow pursuant to their contracts with Mary Kay.

68.     Mary Kay strictly prohibits its products from being sold on all online marketplaces, including Amazon, in part because of the goodwill and consumer safety issues discussed above. When Mary Kay products are sold on online marketplaces, unwitting consumers purchase poor quality products from anonymous sellers who customers cannot identify, preventing Mary Kay from being able to take corrective action to stop the sale of poor quality products that tarnish its reputation.

69.     Mary Kay also prohibits Consultants from selling products through certain other channels, including retail or service establishments and websites.  Mary Kay prohibits sales through these channels to encourage Consultants to display and sell products in interpersonal transactions where Consultants provide customers with vital information regarding Mary Kay products and their uses. Through person-to-person interactions, Consultants are also able to provide explanation and guidance on how to safely and properly use Mary Kay products.

70.     Mary Kay's contracts with its Consultants expressly provide that the prohibition on selling Mary Kay products on online marketplaces and other retail websites survives the termination of the contracts.

71.     Through its contracts, Mary Kay also requires Consultants to follow quality controls relating to the handling, storage, and sale of Mary Kay products.  These quality controls allow Mary Kay to maintain the integrity and quality of its products, guarantee that consumers receive undamaged, genuine goods, and ensure that consumers receive products that meet their specific needs.

72.     As an example, Mary Kay instructs Consultants to rotate their inventory of Mary Kay products and check the manufacture date to determine whether products are expired or soon-to-be expired.  To ensure that consumers receive the freshest possible product, Mary Kay imprints each of its products with a coding system that indicates the date when the product was manufactured.  Most Mary Kay products are produced to have a shelf life of three years from the date of manufacture, which is the standard for the cosmetic industry.  For products with a shelf life of less than three years, the expiration date is clearly indicated on the product packaging.

73.     To ensure that customers receive products of the quality they have come to expect from Mary Kay, Consultants are also prohibited from altering any Mary Kay product, packaging, label, or accompanying literature.  Consultants may sell Mary Kay products only in their original packaging and formulation to prevent customer confusion and erosion in the quality and value of Mary Kay products.

74.     The Consultant Obligations also require Consultants to provide personal services to customers concurrently with and after their sales of Mary Kay products, including providing advice, answering questions, and teaching customers how to use products.  Consultants have

access to literature and other educational materials developed to advise customers on each product's purpose, features, and benefits. Consultants are thus uniquely qualified to explain best practices for safe and optimal use of Mary Kay products, and Consultants are required to provide their contact information so that customers can contact Consultants with any questions about products or completed product purchases. Consultants are also trained and instructed to present only truthful and accurate information about Mary Kay's products and services.

75.      Mary Kay also prohibits Consultants from selling Mary Kay products to persons or entities who resell the products. Consultants are permitted to sell products only to end-user consumers, and only in quantities that are generally purchased by consumers for personal use. The purpose of these restrictions is to ensure that Mary Kay products are sold to consumers only by Consultants who follow Mary Kay's quality controls and over whom Mary Kay can exercise quality control.

76.      Mary Kay provides a complete money-back satisfaction guarantee (the "Satisfaction Guarantee") to consumers who purchase Mary Kay products from Consultants. Under the Satisfaction Guarantee, a consumer can receive a product replacement, product exchange, or full refund if a consumer is not completely satisfied with any Mary Kay product that the consumer purchased from a Consultant. To receive benefits under the Satisfaction Guarantee, consumers must return the product at issue to the Consultant from whom the product was purchased. If the Consultant is no longer active, consumers must return their product to Mary Kay along with proof of purchase.

77.      Mary Kay offers the Satisfaction Guarantee only for products that were sold by sellers who are subject to Mary Kay's quality controls and have agreed to follow its quality controls. Because non-Consultants are not subject to Mary Kay's quality controls and Mary Kay

therefore cannot ensure the quality of products sold by non-Consultants, the Satisfaction Guarantee is not available for Mary Kay products purchased from any seller that is not a Consultant.

### Mary Kay's Discovery of Defendants' Sales of Mary Kay Products on the Internet

78.     Because the unauthorized sale of Mary Kay products over the Internet threatens the safety of consumers and the reputation and goodwill associated with the Mary Kay Trademarks, Mary Kay actively monitors the sale of Mary Kay products online.

79.     Through these efforts, Mary Kay discovered that high volumes of products bearing the Mary Kay Trademarks were being sold on Amazon through a storefront called "BlessmyBuyers"

80.     Mary Kay conducted an investigation to determine the identities of the individual(s) or entity(ies) that operate the "BlessmyBuyers" storefront.  As part of its investigation, Mary Kay caused a Mary Kay product to be purchased from the storefront in July 2019 and then initiated a return of the product.  When the return was initiated, a return mailing label was created which listed the recipients of the product return as:

> Beverly Wanza Faith By Design
> 6704 Tokalon Lane
> Arlington Texas 76002

81.     Through further investigation, Mary Kay discovered that Beverly Wanza used to be a Consultant.  On or around March 2, 2011, entered into a contract with Mary Kay to become a Consultant.  By signing the contract, Wanza agreed to follow all of the Consultant Obligations in exchange for the right to resell Mary Kay products to consumers and receive other benefits provided by the contract.

82.     In April 2014, Mary Kay discovered that Wanza was attempting to sell services of an unrelated business to other Consultants through advertisements on her personal page on

www.facebook.com ("Facebook") that were directed to other Consultants. Mary Kay spoke with Wanza on the phone and sent a letter warning her that her advertisements were a breach of her contract with Mary Kay, which prohibited Wanza from promoting or selling products or services not produced or approved by Mary Kay to other Consultants. Wanza initially denied soliciting Consultants to purchase services from an unrelated business, but eventually admitted her conduct and said that it would stop.

83.     In August 2014, Mary Kay terminated its contract with Wanza after it discovered that Wanza was reselling Mary Kay products on Amazon in breach of her contract. Mary Kay informed Wanza in writing that, even though her contact was terminated, she was still bound by her contract's prohibition on selling Mary Kay products on online marketplaces and other retail websites because that obligation survives the termination of her contract. Wanza has not been a Consultant since August 2014.

84.     Through further investigation, Mary Kay discovered that there is a limited liability company organized under Texas law called "Faith By Design, LLC." Public records list Wanza as the registered agent for Faith By Design, LLC. and list the mailing address and registered office street address for the LLC as 6704 Tokalon Lane, Arlington, TX 76002, which is Wanza's home address and the same address that was listed on the return mailing label that was provided for the product that was purchased from the "BlessmyBuyers" Amazon storefront.

85.     Based on these findings, Mary Kay concluded that Wanza and Faith By Design, LLC. are joint operators of the "BlessmyBuyers" Amazon storefront and are responsible for the conduct complained of herein.

86.     Faith By Design, LLC. is not and has never been a Consultant.

87.     Defendants have sold a high volume of products through their Amazon Storefront. From the beginning of 2019 through the time of filing, Defendants have sold over 9,000 products bearing the Mary Kay Trademarks through their Amazon Storefront for total sales in excess of approximately $334,000.

88.     On July 23, 2019, counsel for Mary Kay sent a cease-and-desist letter to Wanza and Faith by Design, LLC. via email and overnight delivery.  Mary Kay's letter demanded that Defendants permanently cease selling products bearing the Mary Kay Trademarks and also warned Defendants that they are tortuously interfering with Mary Kay's contracts by purchasing products from Consultants, who are prohibited from selling products to non-Consultants who resell the products.

89.     Mary Kay has not received any response to its July 23, 2019 letter.

90.     On or around July 25, all products were delisted from the "BlessmyBuyers" storefront.  However, the storefront resumed listing products bearing the Mary Kay Trademarks late in the day on August 2, 2019, a Friday.  The storefront continued to list and sell products through the weekend until all products were taken down again early in the morning on Monday, August 5.  For the following five weeks, the storefront listed products only during weekends while not listing any products for sale during the work week.  These "weekend only" product listings were an obvious attempt to evade detection by Mary Kay given that, prior to July 25, 2019, the storefront had listed products continuously without ever taking down products for any period of time.  Beginning on September 9 (a Monday) and continuing through the time of filing, however, Defendants have resumed listings products full-time through their Amazon Storefront.

91.     Defendants have also attempted to evade detection by changing the name of their Amazon Storefront.  On August 6, 2019, Defendants changed the name of their storefront from

"BlessmyBuyers" to "BlessMyBuyer."  On August 14, Defendants changed the name of their storefront again to "OnceUponaTime2."  On September 5, Defendants changed the name of their storefront again to "OneTimes2." As of the time of filing, the Amazon Storefront is still called "OneTimes2."

92.     Although Defendants can change the name of their Amazon Storefront at will, every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The Merchant ID number for Defendants' Amazon Storefront is A2DXYVP8PLZIAO.   Even if Defendants change the name of their Amazon storefront again, their storefront can be accessed at the following link that includes the Merchant ID number for their storefront:

    a.   https://www.amazon.com/sp?seller=A2DXYVP8PLZIAO

93.     In August 2019, Mary Kay caused six additional Mary Kay products to be purchased from the Defendants' Amazon Storefront.  After the products were received, their expiration dates were determined through Mary Kay's product coding system.  The expiration dates for the six purchased products are:

    a.   January 5, 2015

    b.   December 21, 2014

    c.   October 25, 2014

    d.   December 29, 2012

    e.   March 5, 2010

    f.   November 21, 2009

94.     Four of the purchased products were also delivered in a package that had a return address of "Beverly Wanza, 674 Tokalon Ln., Arlington, TX 76002," further confirming Wanza's involvement in the operation of the Amazon Storefront.

95.     Defendants continue to sell products bearing the Mary Kay Trademarks through their Amazon Storefront.

**Defendants Are Selling Damaged, Defective, Used, and Poor Quality Products Through Their Amazon Storefront**

96.     Mary Kay's product purchases from the Amazon Storefront by themselves show that Defendants are selling expired products that bear the Mary Kay Trademarks.  However, customer reviews of the Amazon Storefront provide further evidence that Defendants are selling expired products and also show that Defendants are selling products that are counterfeit, tampered with, damaged, previously used, or of otherwise poor quality.  Customer reviews also show that Defendants are providing poor customer service, including for customers who purchased products bearing the Mary Kay Trademarks.

97.     For example, on August 6, 2019, Amazon user "W Etter" complained that she purchased a product from Defendants' Amazon Storefront that purported to be Mary Kay Timewise Filming Eye Cream but was actually counterfeit.  She wrote that "I have used this product for over 15 years and what was in this bottle was runny and does not feel the same on my face!  Extremely disappointed!  This seller is NOT selling Mary Kay product!"



98.     On July 12, 2019, an Amazon Customer complained that she purchased what purported to be two Mary Kay products from Defendants' Amazon Storefront but one of the

products was not in a box, was already open, and was previously used.  She wrote that "[a]t this point [I] am even scared if what's left inside is still Mary Kay Concealer."

> ⭐☆☆☆☆  *"I ordered 2 of this Mary Kay Concealer which happens to be the last 2 from this seller on Amazon and arrived yesterday. On opening the little envelope they came in, One of the concealers is brand new and in its package or box while the second concealer wasn't in a box, opened and used. At this point am even scared if what's left inside is still Mary Kay Concealer. "*
> Read less
> By Amazon Customer on July 12, 2019.

99.     On July 15, 2019, Amazon user "Gwen Haley" complained that a Mary Kay product she received from Defendants was an expired, discontinued product.

> ⭐⭐⭐☆☆  *"The makeup that I received is the much older (expired, shelved) version of this product. I was hoping to receive the more updated product?*
> By Gwen Haley on July 15, 2019.

100.    On July 5, 2019, an Amazon Customer complained that she received a Mary Kay moisturizer product from Defendants that was "very, very runny."  She wrote: "Have used Mary Kay products for a very long time.  Have never gotten moisturizer like this."

> ⭐⭐⭐☆☆  *"Moisturizer is very very runny. Have used Mary Kay products for a very long time. Have never gotten moisturizer like this. "*
> By unknown on July 5, 2019.

101.    On October 26, 2018, Amazon user "Joan Dean" complained that she purchased a Mary Kay cleanser product from Defendants that was "spoiled!" and "probably old and out of date!"  She reported that she threw the product away without using it.

> ⭐☆☆☆☆  *"MK cleanser was spoiled! Probably old and out of date! Threw it out! I usually buy it directly from a dealer, so I know it's consistency and proper odor! "*
> By Joan Dean on October 26, 2018.

102.    On August 5, 2018, Amazon user "Susan K." complained that she purchased a product from Defendants that "was thin and runny, and spilled out unexpectedly" when she "opened the tube to dispense it."  She added that she has "been using this for over 15 years," and is "[c]oncerned about integrity of product."

> ⭐☆☆☆☆  *"Concerned about integrity of product. Been using this for over 15 years. When I opened the tube to dispense it, it was thin and runny, and spilled out unexpectedly. I wish had read the other reviews prior to ordering, as I see another customer had the same experience. "*
> Read less
> By Susan K. on August 5, 2019.

103.    On April 28 2019, Amazon user "Tracy Maranda" complained that she purchased a serum product from Defendants that "has a smell to it that none of my others had" and "came without the box and scratches on the container."  She stated that she is "not comfortable with this product."

> ★☆☆☆☆   "This "serum" has a smell to it that none of my others have had, it came without the box and scratches on the container, not comfortable with this product. "
> By Tracy Maranda on April 28, 2019.

104.    On August 15, 2019, Amazon user "LyndaCT" complained that she purchased a lipstick product from Defendants that "'broke off' from the base within 2 weeks of receiving." She explained that "I have used this particular brand/shade for years and have never had this happen before."

> ★★☆☆☆   "Lipstick "broke off" from the base within 2 weeks of receiving. I have used this particular brand/shade for years and have never had this happen before."
> By LyndaCT on August 15, 2019.

105.    On April 19, 2016, an Amazon Customer complained that she purchased a product from Defendants that was expired and caused her face to break out.

> ★☆☆☆☆   "Broke my face out, was expire. "
> By Amazon Customer on April 19, 2016.

106.    On June 1 2019, Amazon user "Gyengae" complained that she purchased products from Defendants that were damaged when they arrived and came in containers that "have many nicks and scratches."

> ★★☆☆☆   "i received these items damaged, the container have many nicks and scratches. im not going to order from this seller again.
> By Gyengae on June 1, 2019.

107.    On December 3, 2018, Amazon user "RL" complained that she purchased a product from Defendants that was previously used.



108.    On April 27, 2018, Amazon user "Tesa W." complained that, after purchasing a product from Defendants, "I received the wrong item and some of the product was missing."

> ⭐⭐☆☆☆  *"I received the wrong item and some of the product was missing"*
>
> By Tesa W. on April 27, 2018.

109.    On June 8, 2019, Amazon user "Sherry Belk" complained that she ordered three products from Defendants but one of the products was missing and then "took approximately two weeks to finally arrive, with no further communication with new tracking number, date to expect, etc. from seller."  She also noted that the product sold as "new" but "arrived without a box."

> ⭐⭐☆☆☆  *"Order missing 1 of 3 items, promised by seller, but took approximately two weeks to finally arrive, with no further communication with new tracking number, date to expect, etc. from seller. Sold as new product but 1 item arrived without a box."*
> Read less
> By Sherry Belk on June 8, 2019.

110.    On February 23, 2019, Amazon user "Sue W." extensively criticized the customer service provided by Defendants.  She wrote that "I have been waiting over 3 weeks for items worth over 200.00 and [h]ave received nothing but excuses regarding delivery.  You should be embarrassed for taking $$ and having no interest in providing the product or any service recovery for the buyer.  This is a sham and I will let everyone I come in contact with know it…Disaster…anyone looking at this buyer Please bypass Blessmybuyers SHAM!!!"

> ⭐☆☆☆☆  *"I have been waiting over 3 weeks for items worth over 200.00 and gave received nothing but excuses regarding delivery. You should be embarrassed for taking $$ and having no interest in providing the product or any service recovery for the buyer. This is a sham and I will let everyone I come in contact with know it….Disaster…anyone looking at this buyer Please bypass Blessmybuyers SHAM!!!"*
> Read less
> By Sue W. on February 23, 2019.

111.    On July 30, 2019, Amazon user "Sharyl Weber" complained that, after purchasing two products from Defendants, she received "two totally different products . . . other than what was advertised – items I will never use.  Company said they would send correct products with

mailer to mail back the incorrect products.  It has been three weeks and no replacement order has

arrived.  I am simply out the $.”

> ⭐☆☆☆☆ *"Two totally different products arrived other than what was advertised - items I will never use. Company said they would send correct products with mailer to mail back the incorrect products. It has been three weeks and no replacement order has arrived. I am simply out the $. "*
> Read less
> By Sharyl Weber on July 30, 2019.

112.    On June 29, 2019, Amazon user "Mindy Fox" complained that, after purchasing a

product from Defendants, she never received the product and Defendants did not respond to her

inquiries.



113.    On April 25, 2018, Amazon user "F.A. Brann" complained that after purchasing a

"new" product from Defendants, he received a product that was previously used.  When he

requested a return, he heard nothing back from Defendants.

> ⭐⭐☆☆☆ *"I ordered a "new item" from this seller. I received it prior to estimated to delivery date. However, item was written in and used. I requested a return w/in a day or two of receipt of item. Ihave had heard nothing back from the seller re: a refund or an in-process refund for this item. "*
> Read less
> By F. A. Brann on April 25, 2018.

114.    On July 30, 2016, Amazon user "Pamela D." complained that even though she

ordered three Mary Kay products from Defendants, one product took 7-10 days to arrive rather

than 2 days and she had to pay the shipping costs for the delivery.

> ⭐⭐☆☆☆ *"I ordered 3 MaryKay products from the same web sight the other 2 came to my door in 2 days with free shipping. This one took 7-10 days and I had to pay the shipping.*
> Read less
> By Pamela D. on July 30, 2016.

115.    These types of complaints about Defendants are typical of the complaints made

about the products sold and the customer service provided by anonymous, unauthorized sellers on

online marketplaces.  A significant reason that Mary Kay allows its products to be sold only by

Consultants that are subject to its quality controls and prohibits Consultants from selling products

on online marketplaces is to prevent customers from suffering experiences like those described in the above complaints about Defendants.

**Defendants Are Infringing the Mary Kay Trademarks by Selling Products Bearing the Mary Kay Trademarks That Are Not Subject To, Do Not Abide By, and Interfere With Mary Kay's Quality Control Requirements**

116.     Defendants, without authorization from Plaintiffs, have sold—and are currently selling—products bearing the Mary Kay Trademarks through their Amazon Storefront. Defendants and may also be selling products through additional channels that Mary Kay has not yet discovered, and cannot discover until it is able to take discovery.

117.     The products sold by Defendants are not genuine Mary Kay products because they are not subject to, and interfere with, Mary Kay's quality control and customer service requirements that Consultants must follow.

118.     The numerous negative customer reviews of Defendants' Amazon Storefront also show that Defendants are selling products bearing the Mary Kay Trademarks that are of poor quality, expired, tampered with, previously used, and possibly even counterfeit.  Given the high number of customers who have complained about the quality of products bearing the Mary Kay Trademarks that they purchased from Defendants, it is also very likely that Defendants are responsible for some of the negative reviews of Mary Kay products that appear elsewhere on the Amazon marketplace.  *See supra* ¶¶ 39-65.  Further, Mary Kay has itself purchased six products from Defendants' Amazon Storefront that were all expired by at least four years.  For all of these reasons, the products being sold by Defendants are not genuine Mary Kay products because they do not abide by Mary Kay's quality control and customer service requirements that Consultants must follow.

119.    Through their unauthorized use of the Mary Kay Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Mary Kay products.  In reality, however, the products sold by Defendants are materially different from genuine Mary Kay products because they are not subject to, do not abide by, and interfere with Mary Kay's quality control and customer service requirements.

120.    Defendants' total disregard of Mary Kay's cease-and-desist letter, their continued unlawful sales of non-genuine, infringing products, and their attempts to evade Mary Kay's detection by changing the name of their Amazon Storefront and selling products only on weekends all show that Defendants are acting intentionally, willfully, and maliciously.

121.    Upon information and belief, through their Amazon Storefront Defendants accept and fulfill orders from Texas residents for products bearing the Mary Kay Trademarks and cause infringing products bearing the Mary Kay Trademarks to be shipped to persons located in Texas through the regular course of business.

**Defendants Are Infringing the Mary Kay Trademarks by Selling
Products Bearing The Mary Kay Trademarks That
Do Not Come With the Mary Kay Satisfaction Guarantee**

122.    As set forth above, Mary Kay products that are purchased from Consultants come with the Mary Kay Satisfaction Guarantee.  Mary Kay, however, does not provide the Satisfaction Guarantee for products purchased from any seller who is not a Consultant because Mary Kay cannot ensure the quality of products sold by sellers that are not subject to Mary Kay's quality controls.

123.    Because Defendants are not Consultants and, thus, are not subject to Mary Kay's quality control requirements, the products they sell bearing the Mary Kay Trademarks do not come with the Satisfaction Guarantee.

124.    Because the products Defendants sell do not come with the Satisfaction Guarantee, they are materially different from genuine Mary Kay products.

125.    The Satisfaction Guarantee is a material element of genuine Mary Kay products. Consumers considering whether to purchase Mary Kay products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Satisfaction Guarantee.  Consumers who purchase Mary Kay products with the Satisfaction Guarantee receive the peace of mind that they are receiving a high-quality product, that Mary Kay stands behind the product, and that they can get a refund, product replacement, or product exchange if they are dissatisfied with their product for any reason.

126.    Defendants' unauthorized sale of products bearing the Mary Kay Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Mary Kay products that come with the Satisfaction Guarantee when, in fact, they are not.

### Wanza Is Also Falsely Associating Herself with Mary Kay and Infringing the Mary Kay Trademarks by Holding Herself Out as a Consultant and Selling Counterfeit Apparel That Bears the Mary Kay Trademarks

127.    As discussed, Wanza was a Consultant from March 2011 until August 2014, when Mary Kay terminated its contract with Wanza because she was reselling Mary Kay products on Amazon in breach of her contract.  Since August 2014, Wanza has not been a Consultant.

128.    Despite this fact, Wanza currently holds herself out as an "Independent Beauty Consultant at MARY KAY" in her personal Facebook profile, which can be seen by anyone with

a Facebook account.  Wanza's representation can be seen in the below screenshot:



129.     As can be seen in the above screenshot, in her Facebook profile Wanza also identifies herself as "Business Owner at Faith By Design Custom Rhinestone T-Shirts and Accessories."  A user who clicks on "Faith By Design Custom Rhinestone T-Shirts and Accessories" is taken to a separate Facebook page which can be seen in the below screenshot:



130.    Mary Kay is well known for offering to lease pink Cadillac automobiles to

Consultants who sell certain quantities of Mary Kay products to consumers.  As a result, because

of the prominent placement of the words "Pink Cadillac" at the top of the above Facebook page,

users who visit the page are likely confused into believing that the "Faith By Design" business

advertised by the above page is affiliated with Mary Kay.

131.    Both Wanza's personal Facebook page and the Facebook page for "Faith By Design

Custom Rhinestone T-Shirts and Accessories" contain numerous links to product listings on a

private website located at https://www.faithbydesign.net/ (the "Faith By Design Website").
Examples of these links posted on Wanza's personal Facebook page can be seen in the below
screenshots:





132.    On the Faith By Design Website, a consumer can purchase shirts and other types

of apparel.  The "About" section of the website lists Wanza as one of the operators of the website.

133.    Many of the shirts being offered for sale on the Faith By Design Website are

counterfeit products that bear the MARY KAY® and MK® trademarks owned and registered by

Mary Kay.  Examples of these products can be seen in the below screenshots:



Category: Store > Maximize the Miracle - Siobhan Spears Unit Only

SKU 00238 ♡ 11

**$25.00**

👍 Like 1   Share

**Sizes**

☐ V-Neck otherwise it will be round (Crew Neck) (+$1.00)
☐ Fitted runs small so order up a size
☐ Tank (+$3.00)
☐ Long Sleeve (+$3.00)
☐ Small
☐ Medium
☐ Large
☐ XLarge
☐ 2X (+$2.00)
☐ 3X (+$3.00)
☐ 4X-5X only available in regular tshirts (+$5.00)
☐ Sweatshirt (+$5.00)
☐ Hoodie (+$10.00)

Qty [ 1 ]

Add to Bag

Rhinestones

Please state the Size that you would like the shirt in the Notes on Checkout.

Shirts are Regular Fit (True to Size) unless you select differently.

Category: Store

SKU 00237 ♡ 5

**$18.00**

👍 Like 0   Share

**Sizes**

☐ V-Neck otherwise it will be round (Crew Neck) (+$1.00)
☐ Fitted runs small so order up a size
☐ Small
☐ Medium
☐ Large
☐ XLarge
☐ 2X (+$3.00)
☐ 3X (+$3.00)
☐ 4X-5X only available in regular tshirts (+$5.00)

Qty [ 1 ]

Add to Bag



Category: Store > Direct Sales

SKU 00539

$15.00

Like 0   Share

**Sizes**

- [ ] Glitter Vinyl (+$3.00)
- [ ] V-Neck otherwise it will be round (Crew Neck) (+$1.00)
- [ ] Semi Fit District Made - see gallery for size chart
- [ ] Fitted runs small so order up a size
- [ ] RHINESTONES - BLING DESIGN (+$6.00)
- [ ] Small
- [ ] Medium
- [ ] Large
- [ ] Xlarge
- [ ] 2X (+$2.00)
- [ ] 3X (+$3.00)
- [ ] 4X - not available in FITTED (semi fit or regular) (+$4.00)
- [ ] 5XL up - only in regular size tees (+$5.00)

Qty [ 1 ]

Add to Bag

NOTE: THESE ARE REGULAR TEES UNLESS OTHERWISE NOTED>>>>>Please state the Color and Size that you would like the shirt in the Notes on Checkout.

Matte Vinyl - Option for Glitter Vinyl in Selections of sizes.

Category: Store > Direct Sales

SKU 00485

$8.00

Like 0   Share

**Options**

- [ ] Glitter Vinyl (+$2.00)
- [ ] Bling (+$4.00)
- [ ] 10 Pak - Any Style of Wording -(SAME) (+$90.00)

Qty [ 1 ]

Add to Bag



Category: Store > Direct Sales

SKU 00476

$22.00

Like 0   Share

**Options**

☐ Fitted Shirt - Run Small Order up a size
☐ Regular unisex Tee
☐ Black Color
☐ White Color
☐ Small
☐ Medium
☐ Large
☐ Extra Large
☐ 2xl (+$3.00)
☐ 3xl (+$4.00)
☐ 4X-5X only available in regular tshirts (+$5.00)
☐ semi fit tee - run true to size

Qty [1]

Add to Bag

Please state the Color you would like the shirt in the Notes on Checkout.

Shirts are Regular Fit (True to Size) unless you select differently.

Category: Store > Direct Sales

SKU 00322

$23.00

Like 0   Share

**Sizes**

☐ V-Neck otherwise it will be round (Crew Neck) (+$1.00)
☐ Fitted - runs small so order up a
☐ Tank (+$3.00)
☐ Long Sleeve (+$3.00)
☐ Small
☐ Medium
☐ Large
☐ X-Large
☐ 2X (+$2.00)
☐ 3X (+$3.00)
☐ 4X-5X only available in Regular Tshirts (+$5.00)
☐ Sweatshirt (+$5.00)
☐ Hoodie (+$10.00)

Qty [1]

Add to Bag

Vinyl Design

Please state the Color that you would like the shirt in the Notes on Checkout.

Shirts are Regular Fit (True to Size) unless you select differently.



134.    Wanza has had no rights to use Mary Kay's intellectual property ever since she was terminated as a Consultant in August 2014.  None of the products in the foregoing screenshots are manufactured, approved, or authorized by sale by Mary Kay.  Each of these counterfeit products infringes the Mary Kay Trademarks.

135.    By selling counterfeit and infringing goods online, Wanza is holding herself out as having Mary Kay's permission to sell and distribute goods bearing the Mary Kay Trademarks.

136.    Wanza has also posted images of some of the counterfeit products on her personal Facebook page.  Because Wanza also represents on her Facebook page that she is a Consultant, Wanza's posts are likely to cause consumers to mistakenly believe that the counterfeit products are actually genuine products that have been manufactured by or approved for sale by Mary Kay.  An example of one of Wanza's posts can be seen in the below screenshot:



137.    The Faith By Design Website is also selling shirts that very closely resemble shirts Mary Kay has authorized for sale.  As an example, Mary Kay is currently offering for sale a shirt that references a paid cruise called "Destination Red" that Mary Kay is offering to Consultants who achieve high sales during a portion of 2019.  Below on the left is a screenshot of the shirt that

Mary Kay is offering on the sale.  Below on the right is a shirt listed for sale on the Faith By Design Website that closely resembles the shirt being sold by Mary Kay:



138.    By selling shirts with words, symbols, colors, and overall appearance that are nearly identical to shirts that Mary Kay has approved for sale, Wanza is deceiving consumers into wrongly believing that the shirts and counterfeit products Wanza is selling are actually genuine products that have been manufactured by or approved for sale by Mary Kay.

139.    Wanza continues to sell counterfeit products bearing the Mary Kay Trademarks through the Faith By Design Website and advertise the products through her profile page on Facebook.  Wanza may also be selling counterfeit products through additional channels that Mary Kay has not yet discovered, and cannot discover until it is able to take discovery.

140.    Upon information and belief, Faith By Design, LLC. also assists in the operation of the Faith By Design Website and is responsible at least in part for the sales of counterfeit products bearing the Mary Kay Trademarks.

**Mary Kay Has Suffered Substantial Harm as a Result of Defendants' Conduct**

141.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, significant monetary harm including, but not limited to, loss of sales, damage to the value of its intellectual property, harm to the goodwill associated with the Mary Kay brand, and damage to its existing and potential business relations.

142.    Defendants' conduct was and is knowing, intentional, willful, malicious, wanton, and contrary to law.

143.    Mary Kay is entitled to injunctive relief because Defendants will otherwise continue to sell unlawfully counterfeit products bearing the Mary Kay Trademarks and expired products bearing the Mary Kay Trademarks that are materially different from genuine Mary Kay products sold by Consultants and are not subject to, interfere with, and do abide by Mary Kay's quality controls, thereby compromising Mary Kay's quality controls.  Defendants' ongoing illegal conduct has caused and will continue to cause irreparable harm to Mary Kay's reputation, goodwill, business relationships, intellectual property, and brand integrity.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(a)**

144.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

145.    Mary Kay owns the Mary Kay Trademarks.

146.    Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

147.    The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

148.    Defendants have willfully and knowingly used, and continue to use, the Mary Kay Trademarks in commerce for the purpose of selling products on the Internet without Mary Kay's consent.

149.    The products that Defendants sell bearing the Mary Kay Trademarks are not authorized for sale by Mary Kay.

150.    Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Mary Kay Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Mary Kay.

151.    Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Mary Kay products.

152.    The products sold by Defendants are not, in fact, genuine and authentic Mary Kay products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Mary Kay's quality control requirements that Consultants must follow.

153.    The products sold by Defendants do not abide by Mary Kay's quality control requirements, among other reasons, because they are expired, tampered with, previously used, and or of otherwise poor quality.

154.    Defendants have also willfully and knowingly used the Mary Kay Trademarks in commerce by selling unauthorized apparel bearing the Mary Kay Trademarks in the United States.

155.    This use of the Mary Kay Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it causes consumers to falsely believe that they are purchasing genuine apparel that originates from, is sponsored by, authorized by, or otherwise connected with Mary Kay when it is not.

156.    Defendants' unauthorized use of the Mary Kay Trademarks has materially damaged the value of the Mary Kay Trademarks, caused significant damage to Mary Kay's business relations, and infringed on the Mary Kay Trademarks.

157.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

158.    Mary Kay is entitled to recover its damages caused by Defendants' infringement of the Mary Kay Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

159.    Mary Kay is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Mary Kay will suffer irreparable harm.

160.    Mary Kay is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Mary Kay Trademarks.

### SECOND CAUSE OF ACTION
**Trademark Counterfeiting**
**15 U.S.C. § 1114**

161.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

162.    Mary Kay owns the Mary Kay Trademarks.

163.    Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

164.    The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

165.    Defendants willfully and knowingly used in commerce, and continue to use, counterfeit reproductions of the Mary Kay Trademarks that are identical with, or substantially indistinguishable from, the Mary Kay Trademarks on goods covered by Mary Kay's federal trademark registrations.

166.    Defendants have intentionally used these spurious designations, knowing that they are counterfeit, in connection with the advertisement, promotion, sale, offering for sale, and distribution of goods.

167.    Defendants' use of the Mary Kay Trademarks to advertise, promote, offer for sale, distribute, and sell products bearing counterfeit trademarks was at all times and is currently without Mary Kay's authorization, license, or consent.

168.    Defendants' unauthorized use of the Mary Kay Trademarks on goods bearing counterfeit trademarks in connection with their advertisement, promotion, sale, offering for sale, and distribution of goods on the Internet constitutes use of the Mary Kay Trademarks in commerce.

169.    Defendants' unauthorized use of the Mary Kay Trademarks is likely to: (a) cause confusion, mistake, and deception; (b) cause the public to incorrectly believe that Defendants' goods are the same as goods manufactured by Mary Kay and/or that the products sold by Defendants are affiliated with, connected to, associated with, or in some way related to Mary Kay; (c) result in Defendants benefiting from Mary Kay's advertising and promotion; and (d) result in

Defendants unfairly profiting from Mary Kay's reputation and trademarks, all to the substantial and irreparable injury of the public, Mary Kay, the Mary Kay Trademarks, and the substantial goodwill they represent.

170.    Defendants' acts constitute willful trademark counterfeiting in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

171.    By reason of the foregoing, Defendants are liable to Mary Kay for: (a) statutory damages of up to $2,000,000 for each mark counterfeited as provided by 15 U.S.C. § 1117(c) of the Lanham Act, or, at Mary Kay's election, an amount representing three (3) times Mary Kay's damages and/or Defendants' illicit profits; and (b) reasonable attorneys' fees, investigative fees, and pre-judgment interest pursuant to 15 U.S.C. § 1117(b).

172.    Mary Kay is also entitled to temporary, preliminary, and permanent injunctive relief, including an order permitting the seizure of all "goods and counterfeit marks . . . the means of making such [counterfeit] marks, and records documenting the manufacture, sale, or receipt of things involved in such [counterfeiting] violation[s]" pursuant to 15 U.S.C. § 1116(d).

173.    As a proximate result of Defendants' actions, Mary Kay has suffered, and continues to suffer, immediate and irreparable harm.  Mary Kay has also suffered, and continues to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
**False Association**
**15 U.S.C. § 1125(a)(1)(A)**

174.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

175.    Mary Kay owns the Mary Kay Trademarks.

176.     Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

177.     The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

178.     Defendants are willfully and knowingly selling cosmetics and apparel products bearing the Mary Kay Trademarks in commerce on the Internet.

179.     In connection with the sales of these goods, Defendants are using words, terms, names, and symbols which are likely to deceive consumers into wrongly believing that the goods are affiliated with, associated with, sponsored by, authorized by, or otherwise connected with Mary Kay.  Specifically, Defendants are selling goods that bear the Mary Kay Trademarks and also symbols that are nearly identical those that appear on apparel products Mary Kay is selling,

180.     Defendants are also deceiving consumers into wrongly believing that the goods are affiliated with, associated with, sponsored by, authorized by, or otherwise connected with Mary Kay by affirmatively representing that Wanza is a Consultant.

181.     As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.  Defendants have also completed sales and earned revenue that they would not have earned if consumers were not deceived into believing that Wanza is a Consultant and that the cosmetics and apparel products Defendants are selling are affiliated with, associated with, sponsored by, authorized by, or otherwise connected with Mary Kay

182.     Mary Kay is entitled to recover its damages caused by Defendants' false association and disgorge Defendants' profits from their unjust enrichment.

183.   Mary Kay is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' false association, and unless Defendants are permanently enjoined, Mary Kay will suffer irreparable harm.

184.   Mary Kay is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in false association.

## FOURTH CAUSE OF ACTION
### Trademark Dilution
### 15 U.S.C. § 1125(c)

185.   Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

186.   Products bearing the MARY KAY® trademark have been sold to the public since 1963.  For 56 years, Mary Kay has been recognized by consumers as the source of high quality products bearing the MARY KAY® trademark, beginning with cosmetics products and expanding to many other types of products.

187.   The MARY KAY® trademark was first filed with the United States Patent and Trademark Office in 1964, and was registered in 1966.  Since that time, the MARY KAY® trademark has been filed and registered with respect to numerous categories of goods and services.

188.   Mary Kay is the owner of the MARY KAY® trademark, and has registered the trademark with the United States Patent and Trademark Office.

189.   The MARY KAY® trademark is valid, subsisting, and in full force and effect.

190.   Mary Kay has expended substantial time, effort, money, and resources advertising and promoting products and services under the MARY KAY® trademark.  As a result of Mary

Kay's efforts, the MARY KAY® trademark is the means by which Mary Kay products and services are distinguished from others in the marketplace.

191.   Mary Kay markets, advertises, and sells products bearing the MARY KAY® trademark throughout the United States.

192.   Mary Kay has implemented legitimate and substantial quality controls that it requires all Consultants to follow to protect the Mary Kay name and brand.

193.   Consumers throughout the United States recognize and associate the Mary Kay name with quality.

194.   Because of the quality, durability, and dependability of Mary Kay products and Mary Kay's use of the MARY KAY® trademark, consumers trust the Mary Kay name and Mary Kay products.

195.   The MARY KAY® trademark is inherently distinctive, and as a result of Mary Kay's long and continuous use of the MARY KAY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Mary Kay's products and services.

196.   Mary Kay is widely recognized by the general consuming public as the designated source of goods bearing the MARY KAY® trademark.

197.   For these reasons, since at least 1980, the MARY KAY® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

198.   After the MARY KAY® trademark became famous, beginning in or around 2017, Defendants have willfully used the MARY KAY® trademark in connection with the unauthorized and illegal sale of products.

199.   Because the products sold by Defendants do not come with the Satisfaction Guarantee and are not subject to and do not abide by Mary Kay's quality controls, consumers who

purchase products from Defendants are more likely to receive a poor quality, damaged, expired, or defective product and have an unsatisfactory customer experience.  Indeed, numerous customers have complained about receiving poor quality products bearing the Mary Kay Trademarks from Defendants, and have also complained about Defendants' customer service.  Mary Kay itself has also purchased six products from Defendants that were all expired by at least four years.

200.    Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by Consultants are likely to associate that negative experience with Mary Kay and the MARY KAY® trademark.  As a result, Defendants' unauthorized and willful use of the MARY KAY® trademark is tarnishing and diluting the value and distinctive quality of the MARY KAY® trademark.

201.    Defendants' unlawful actions have harmed the reputation and goodwill associated with the MARY KAY® trademark, and Mary Kay has suffered and will continue to suffer immediate and irreparable injury.  Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine Mary Kay products.

202.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

203.    Mary Kay is entitled to recover its damages caused by Defendants' dilution of the MARY KAY® Trademark and disgorge Defendants' profits from their unlawful sales and unjust enrichment.

204.    Mary Kay is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement, and unless Defendants are permanently enjoined, Mary Kay will suffer irreparable harm.

205.    Mary Kay is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Mary Kay Trademarks.

## FIFTH CAUSE OF ACTION
### Trademark Dilution
### Tex. Bus. & Com. Code § 16.103

206.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

207.    This claim arises under the laws of the State of Texas.

208.    Mary Kay is the owner of the MARY KAY® trademark, and has registered the trademark with the United States Patent and Trademark Office.

209.    The MARY KAY® trademark is valid, subsisting, and in full force and effect.

210.    Mary Kay has expended substantial time, effort, money, and resources advertising and promoting products and services under the MARY KAY® trademark.  As a result of Mary Kay's efforts, the MARY KAY® trademark is the means by which Mary Kay products and services are distinguished from others in the marketplace.

211.    Mary Kay markets, advertises, and sells products bearing the MARY KAY® trademark throughout the United States, including in Texas.

212.    Mary Kay has implemented legitimate and substantial quality controls that it requires all Consultants to follow to protect the Mary Kay name and brand.

213.    Consumers throughout the United States, including in Texas, recognize and associate the Mary Kay name with quality.

214.    Because of the quality, durability, and dependability of Mary Kay products and Mary Kay's use of the MARY KAY® trademark, consumers trust the Mary Kay name and Mary Kay products.

215.    The MARY KAY® trademark is inherently distinctive, and as a result of Mary Kay's long and continuous use of the MARY KAY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Mary Kay's products and services.

216.    Mary Kay is widely recognized by the general consuming public, including consumers in Texas, as the designated source of goods bearing the MARY KAY® trademark.

217.    For these reasons, since at least 1980, the MARY KAY® trademark has been famous, distinctive, and a widely recognized mark by the consuming public.

218.    After the MARY KAY® trademark became famous, beginning in or around 2017, Defendants have willfully used the MARY KAY® trademark in connection with the unauthorized and illegal sale of products.

219.    Because the products sold by Defendants do not come with the Satisfaction Guarantee and are not subject to and do not abide by Mary Kay's quality controls, consumers who purchase products from Defendants are more likely to receive a poor quality, damaged, expired, or defective product and have an unsatisfactory customer experience.  Indeed, numerous customers have complained about receiving poor quality products bearing the Mary Kay Trademarks from Defendants, and have also complained about Defendants' customer service.  Mary Kay itself has also purchased six products from Defendants that were all expired by at least four years.

220.    Consumers who receive poor quality products that do not come with the Satisfaction Guarantee or customer service provided by Consultants are likely to associate that negative experience with Mary Kay and the MARY KAY® trademark.  As a result, Defendants'

unauthorized and willful use of the MARY KAY® trademark is tarnishing and diluting the value and distinctive quality of the MARY KAY® trademark.

221.    Defendants' unlawful actions have harmed the reputation and goodwill associated with the MARY KAY® trademark, and Mary Kay has suffered and will continue to suffer immediate and irreparable injury.  Further, Defendants' actions have harmed and will continue to harm consumers interested in purchasing genuine Mary Kay products.

222.    As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

223.    Because Defendants have willfully, intentionally, maliciously, and in bad faith infringed on the MARY KAY® trademark, this case qualifies for an award three times the amount of profits and damages and an award of attorneys' fees pursuant to Tex. Bus. & Com. Code §§ 16.103(c) and 16.104(c).

### SIXTH CAUSE OF ACTION
### Texas Common Law Trademark Infringement and Unfair Competition

224.    Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

225.    This claim arises under the laws of the State of Texas.

226.    Mary Kay owns the Mary Kay Trademarks.

227.    Mary Kay has registered the Mary Kay Trademarks with the United States Patent and Trademark Office.

228.    The Mary Kay Trademarks are valid and subsisting trademarks in full force and effect.

229.    Defendants have willfully and knowingly used, and continue to use, the Mary Kay Trademarks in commerce for the purpose of selling products on the Internet without Mary Kay's consent.

230.    The products that Defendants sell bearing the Mary Kay Trademarks are not authorized for sale by Mary Kay.

231.    Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Mary Kay Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Mary Kay.

232.    Defendants' use of the Mary Kay Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Mary Kay products.

233.    The products sold by Defendants are not, in fact, genuine and authentic Mary Kay products.  The products sold by Defendants are materially different because, among other reasons, they are ineligible for the Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Mary Kay's quality control requirements that Consultants must follow.

234.    The products sold by Defendants do not abide by Mary Kay's quality control requirements, among other reasons, because they are expired, tampered with, previously used, and or of otherwise poor quality.

235.    Defendants have also willfully and knowingly used the Mary Kay Trademarks in commerce by selling unauthorized apparel bearing the Mary Kay Trademarks in the United States.

236.     This use of the Mary Kay Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it causes consumers to falsely believe that they are purchasing genuine apparel that originates from, is sponsored by, authorized by, or otherwise connected with Mary Kay when it is not.

237.     Defendants' unauthorized use of the Mary Kay Trademarks has materially damaged the value of the Mary Kay Trademarks, caused significant damage to Mary Kay's business relations, and infringed on the Mary Kay Trademarks.

238.     As a proximate result of Defendants' actions, Mary Kay has suffered, and will continue to suffer, great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

239.     Mary Kay is entitled to recover its damages caused by Defendants' infringement of the Mary Kay Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

240.     In harming Mary Kay, Defendants have acted with willful misconduct and actual malice.  Accordingly, Mary Kay is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### Breach of Contract – Wanza

241.     Mary Kay re-alleges and incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

242.     Wanza entered into a valid contract ("Contract") with Mary Kay to become a Consultant.  By entering into the Contract, Wanza agreed to follow all of the Consultant Obligations in exchange for the right to resell Mary Kay products to consumers and receive other benefits provided by the contract.

243.    The Contract prohibits Wanza from selling Mary Kay products on Internet websites including Amazon.  The Contract also provides that this prohibition survives the termination of the Contract.

244.    Mary Kay fulfilled all of its obligations under the Contract.

245.    All conditions required by the Contract for Wanza's performance have occurred.

246.    Wanza has materially breached the Contract by offering for sale and selling Mary Kay products on both Amazon.

247.    As a direct and proximate result of Wanza's material breaches of the Contract, Mary Kay has suffered great damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

248.    Pursuant to Tex. Civ. Prac. & Rem. Code § 38.001(8), Mary Kay is entitled to recover its reasonable attorney's fees from Wanza because of Wanza's breach of her written contract with Mary Kay.

249.    In harming Mary Kay, Wanza has acted with willful misconduct and actual malice. Accordingly, Mary Kay is entitled to an award of punitive damages.

## CONDITIONS PRECEDENT

250.    All conditions precedent to Mary Kay's claims for relief, if any, have occurred or have been performed.

## REQUEST FOR ATTORNEYS' FEES

251.    Mary Kay is entitled to recover its attorneys' fees and costs for this action, pursuant to the federal and state law identified herein, and Mary Kay hereby seeks such recovery from Defendants of all its reasonable and necessary attorneys' fees and costs for prosecuting this action and obtaining the relief requested herein.

## JURY DEMAND

252.    Plaintiff demands a trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Mary Kay prays for relief and judgment as follows:

A.    Judgment in favor of Mary Kay and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, disgorgement of profits, punitive damages, exemplary damages, and pre-judgment and post-judgment interest as permitted by law;

B.    That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Mary Kay products,

ii)    Prohibiting the Enjoined Parties from using any of the Mary Kay Trademarks in any manner, including advertising on the Internet,

iii)    Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Mary Kay products as well as any products bearing any of the Mary Kay Trademarks,

iv)     Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Mary Kay Trademarks including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks,

v)     Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Mary Kay's products, or any of the Mary Kay Trademarks,

vi)     Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Mary Kay Trademarks which associate Mary Kay's products or the Mary Kay Trademarks with the Enjoined Parties or the Enjoined Parties' websites, and

vii)     Requiring the Enjoined Parties to take all action to remove the Mary Kay Trademarks from the Internet, including from the websites www.amazon.com and www.faithbydesign.net;

C.     An award of attorneys' fees, costs, and expenses; and

D.     Such other and further relief as the Court deems just, equitable and proper.

Respectfully submitted,

*/s/ Christopher J. Schwegmann*

Christopher J. Schwegmann
Texas Bar No. 24051315
cschwegmann@lynnllp.com

**LYNN PINKER COX & HURST, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 – Telephone
(214) 981-3829 – Facsimile

**ATTORNEYS FOR PLAINTIFF**
**MARY KAY INC.**